T.C. Summary Opinion 2003-61


UNITED STATES TAX COURT


EDWARD CHARLES JONES, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 9803-00S.          Filed May 27, 2003.


Edward Charles Jones, pro se.

<u>Brook D. Remick</u>, for respondent.


COUVILLION, <u>Special Trial Judge</u>:  This case was heard pursuant to section 7463 of the Internal Revenue Code in effect at the time the petition was filed.[1]  The decision to be entered

---

[1]    Unless otherwise indicated, subsequent section references are to the Internal Revenue Code in effect for the years at issue.  Rule references are to the Tax Court Rules of Practice and Procedure.

is not reviewable by any other court, and this opinion should not be cited as authority.

Respondent determined a deficiency of $1,939 in petitioner's Federal income tax for 1998. After concessions by petitioner, the issue for decision is whether petitioner was an employee or an independent contractor in connection with the performance of services during 1998.[2] The issue involves the question whether petitioner's home office expenses are deductible as trade or business expenses on Schedule C, Profit or Loss From Business, as petitioner claimed, or as unreimbursed employee business expenses on Schedule A, Miscellaneous Itemized Deductions, as respondent determined in the notice of deficiency.

Some of the facts were stipulated. Those facts, with the annexed exhibits, are so found and are made part hereof. Petitioner's legal residence at the time the petition was filed was Horseshoe Bay, Texas.

Petitioner has a college degree in electrical engineering. During his career, he worked for General Electric Corp. and IBM Corp. (IBM). Although he started as an electrical engineer, he rose to the level of senior engineer/technical management by 1970. He worked for IBM for 28 years. Part of his work for IBM

---

[2] Petitioner conceded issues relating to a passive activity, deductions for real property taxes and home mortgage interest expense, "other income", and various computational errors.

involved building computers for airplanes and submarines for the U.S. Navy (the Navy).  In 1989, petitioner retired from IBM.  At that time, petitioner was living in Manassas, Virginia.

Before his retirement, petitioner had discussions with his contacts in the Navy in which they indicated their desire to have petitioner consult for them.  Approximately 2 years after petitioner retired from IBM, he was contacted by Navy personnel at Crystal City, Virginia, to discuss a formal consulting arrangement.  Soon thereafter, petitioner attended a meeting with a group of Navy personnel, including a captain who, during the meeting, called in a representative of the Navy's contract administrator.  At that meeting petitioner negotiated to work on a contract basis for the Navy at a rate of $50 per hour.   The work would involve document review and extensive travel.

The contract administrator for the Navy was a company called Techmatics, which had headquarters in Fairfax, Virginia.  After he commenced his services, petitioner submitted invoices to Techmatics from time to time listing his hours and mileage. Techmatics paid him by check for the hours worked and his expenses.  The checks listed petitioner as a "vendor".  For the first several years of their affiliation, prior to 1998, Techmatics reported these payments to petitioner on Forms 1099-MISC, Miscellaneous Income, and petitioner reported the income on his Federal income tax returns on Schedule C.

During 1996, petitioner moved to Texas. That same year, Techmatics facilitated a change in the way petitioner was paid. To save overhead expenses, they requested that petitioner begin submitting time cards instead of invoices. Petitioner received an offer letter for "a part-time position as a Principal Engineer" from W.S. Szczypinski, executive vice president of Techmatics, dated October 11, 1996. The letter stated in part: "As a non-exempt employee you may work no longer than 40 hours per week without prior written authorization." The letter further stated: "As a part-time employee you may be eligible for medical/life and dental benefits as outlined on the enclosed benefits summary. The 401(k) savings plan is also available to you. You will be paid through our payroll department on the 10[th] and 25[th] of each month."

Petitioner agreed to this new arrangement and signed what appeared to be a standard form employment agreement with Techmatics (the agreement).[3] The purpose of the agreement was stated as follows:

> This Agreement sets forth certain acts during the employment relationship or following its termination that would be inconsistent with obligations of the Employee arising out of that relationship and with the position of trust and confidence in which the Employee is placed as a result of the relationship. The Company places a high degree of trust

---

[3] The employment agreement does not reflect a signature of anyone from Techmatics.

and confidence in its employees and wants to make sure that the Employee knows what would be considered a breach of this trust, particularly in dealing with present and potential clients.

The agreement further stated:

Company agrees to employ Employee for the term hereof, and Employee agrees to devote such time and effort as may be necessary for proper fulfillment of his/her duties and responsibilities to the business of the Company and to serve locally in any location as the Company may direct. Employee will be required to work normal business hours or such number of hours as his/her duties may require. Employee shall perform all assigned duties faithfully, diligently, and to the best of Employee's ability during the term hereof.

The agreement provided for a probationary period, the ownership and handling of proprietary information, the use of the employee's work product, noncompetition clauses, and other language. The agreement was silent as to the benefits petitioner would receive. It did not provide a term for the engagement except that either party could terminate the agreement with 14 days written notice. The agreement would terminate upon a breach by either party or the death of petitioner, or with 30 days notice to petitioner if an ownership change of the company occurred.

Petitioner signed the agreement on October 22, 1996. Thereafter, petitioner submitted a time card every 2 weeks and was paid from Techmatics' common payroll system. At this time

Techmatics began paying the employer's share of Social Security taxes on petitioner's behalf.  However, Techmatics did not provide any pension plan, major medical insurance, disability insurance, flexible spending, life insurance, or other benefits to petitioner.  Petitioner traveled extensively and submitted travel vouchers for reimbursement of travel expenses.  After this administrative change, Techmatics began reporting petitioner's compensation, for tax purposes, on Form W-2, Wage and Tax Statement.

Part of petitioner's consulting services involved the technical engineering design and manufacture of what was referred to as advance signal processors.  He also helped implement a program to assist the Navy in implementing off-the-shelf, rather than custom-made, computer components.  Occasionally on such projects, petitioner would take a leadership role, working with Navy project managers and senior engineers.  At one point the Navy provided him with a portable computer for use in his work, which he returned.  Techmatics, by contrast, did not provide any equipment to petitioner.

Petitioner did not perform any services at Techmatics' headquarters or offices.  His work was performed at home or at the manufacturing or research sites involved in the Navy projects.  The latter sites included the A&T Laboratory at Murray, New Jersey, a manufacturing facility in Greensboro, North

Carolina, and various Navy bases.  The work he did at home included long distance conference calls to discuss technical issues, receiving and reviewing documents, and faxing documents back and forth to his colleagues with comments.  When petitioner moved to Texas in 1996, the Navy increased the travel budget on petitioner's projects in order to retain his services.  Even after he moved, as he testified:  "[F]ax machines and emails and telephones [proved] adequate to provide that service.  And most of the other work was done, again, flying around the country."

Petitioner continued to perform such services through 1998. In 1998, the major project petitioner was working on was completed.  Thereafter, petitioner worked on smaller projects, but the amount of available work waned.  Eventually, petitioner was no longer providing any services or receiving compensation from Techmatics, although his affiliation with Techmatics continued.  In May 1998, Techmatics was acquired by Anteon Corp. On March 31, 2000, a vice president of Anteon terminated the company's relationship with petitioner via a letter that stated, in pertinent part:

> According to our records, you have been a "part time" employee with Anteon Corporation, Systems Engineering Group (formerly Techmatics Inc.) since November 1996.  However, our records show that you have not worked for the company in calendar year 1999.  Therefore, in keeping with Anteon Corporation's standard practices, your employment will be discontinued effective April 1, 2000.

No one from Techmatics or its successor, Anteon Corp., testified at trial. However, the personnel file of petitioner was obtained from Anteon through a subpoena duces tecum and jointly submitted into evidence. In addition to the employment agreement and various correspondence, the records included Salary Review Worksheets periodically prepared by Techmatics personnel regarding petitioner. These reviews reflected ratings in which petitioner met or exceeded expectations. The 1998 review increased petitioner's compensation from $50 to $52 per hour. The records support petitioner's assertion that he worked at home but do not show whether Techmatics would have provided petitioner with office space had he requested it.

The compensation petitioner received from Techmatics during 1998 totaled $26,516, which was reflected on Form W-2. That income was reported by petitioner on his 1998 Federal income tax return as wage and salary income. However, petitioner also included with his 1998 return a Schedule C in which he claimed as deductions the expenses incurred in connection with his activity with Techmatics. The expenses totaled $13,480. No gross receipts were reported on Schedule C; however, a notation on the income portion of Schedule C included the statement "See attached -- W-2 -- Techmatics." Thus, the Schedule C reported a net loss of $13,480; consequently, there was no computation of self-

employment tax.[4]  The $13,480 claimed as expenses on petitioner's Schedule C included $12,301 for home office expenses.[5]  In the notice of deficiency, respondent determined that the claimed home office expenses were unreimbursed employee business expenses that were allowable as itemized deductions, subject to the limitations of section 67, rather than as deductions related to a trade or business activity.  Petitioner contends he was an independent contractor and was not an employee of Techmatics.  Therefore, he contends, the expenses are deductible as trade or business expenses on Schedule C of his return.

At the outset, the Court notes that only the 1998 year is properly before the Court.  A valid notice of deficiency and a timely filed petition are prerequisites to this Court's jurisdiction to redetermine a deficiency.  Secs. 6212 and 6213; e.g., Pyo v. Commissioner, 83 T.C. 626, 632 (1984).  The burden of proving that this Court has jurisdiction is on the taxpayer. Cassell v. Commissioner, 72 T.C. 313, 317-318 (1979); Patz Trust v. Commissioner, 69 T.C. 497, 503 (1977).  Moreover, each taxable

---

[4]    Petitioner also included two other Schedules C for two other trade or business activities, with losses totaling $1,774. These activities are not at issue in this case.

[5]    Petitioner made computational errors on his original return but has conceded respondent's computations.  The amounts of home mortgage interest and real estate taxes paid in 1998 attributable to his activity with Techmatics were $1,059 and $97, respectively.

year stands alone.  Pekar v. Commissioner, 113 T.C. 158, 166 (1999).

On his petition, petitioner referenced the years 1997 and 1998 as being at issue; however, the notice of deficiency makes no determinations with respect to his 1997 tax year.  At trial, petitioner argued that the Taxpayer Advocate office of the Internal Revenue Service had represented to him that his passive activity issue would be combined for 1997 and 1998 and contended that respondent should be bound by his own standards as reflected by such representations.  In spite of petitioner's apparent frustration, the fact remains that the notice of deficiency on which this case is based addresses only petitioner's 1998 tax year.  The 1997 tax year is not before the Court, and, therefore, this Court has no jurisdiction over that year.

The issue for decision is whether petitioner was an employee or independent contractor of Techmatics during 1998.[6]  Whether an individual is an employee or independent contractor is a factual question to which common law principles apply.  Nationwide Mut. Ins. Co. v. Darden, 503 U.S. 318, 323 (1992); Weber v.

---

[6]  Sec. 7491, under certain circumstances, places the burden of proof on respondent with respect to a taxpayer's liability for taxes in court proceedings arising in connection with examinations commencing after July 22, 1998.  The examination of petitioner's return commenced after July 22, 1998.  However, the parties did not address the applicability of sec. 7491 to this case.  Therefore, the Court decides this case on a preponderance of the evidence and without regard to the burden of proof.  See Kraus v. Commissioner, T.C. Memo. 2003-10.

Commissioner, 103 T.C. 378, 386 (1994), affd. 60 F.3d 1104 (4th Cir. 1995); Profl. & Exec. Leasing, Inc. v. Commissioner, 89 T.C. 225, 232 (1987), affd. 862 F.2d 751 (9th Cir. 1988). Factors that are relevant in determining the substance of an employment relationship include: (1) The degree of control exercised by the principal over the details of the work; (2) the taxpayer's investment in the facilities used in his or her work; (3) the taxpayer's opportunity for profit or loss; (4) the permanency of the relationship between the parties; (5) the principal's right of discharge; (6) whether the work performed is an integral part of the principal's regular business; (7) the relationship the parties believe they are creating; and (8) the provision of employee benefits. NLRB v. United Ins. Co. of Am., 390 U.S. 254, 258 (1968); Weber v. Commissioner, supra at 387; Profl. & Exec. Leasing, Inc. v. Commissioner, supra at 232; see also secs. 31.3121(d)-(1)(c)(2), 31.3401(c)-1(a) and (b), Employment Tax Regs.

No single factor is dispositive; the Court must assess and weigh all incidents of the relationship. Nationwide Mut. Ins. Co. v. Darden, supra at 324. The factors are not weighed equally; they were weighed according to their significance in the particular case. Aymes v. Bonelli, 980 F.2d 857, 861 (2d Cir. 1992). Moreover, while all of the above factors are important, the right-to-control test is the "master test" in determining the

nature of a working relationship.  Matthews v. Commissioner, 92 T.C. 351, 361 (1989), affd. 907 F.2d 1173 (D.C. Cir. 1990); accord Weber v. Commissioner, supra at 387.

Both the control exercised by the alleged employer and the degree to which the alleged employer may intervene to impose control must be examined.  Radio City Music Hall Corp. v. United States, 135 F.2d 715, 717 (2d Cir. 1943); Weber v. Commissioner, supra at 387-388; deTorres v. Commissioner, T.C. Memo. 1993-161.  "[N]o actual control need be exercised, as long as the employer has the right to control."  Profl. & Exec. Leasing, Inc. v. Commissioner, 862 F.2d at 753.  In order for an employer to retain the requisite control over the details of an employee's work, the employer need not direct each step taken by the employee.  Profl. & Exec. Leasing, Inc. v. Commissioner, 89 T.C. at 234; Gierek v. Commissioner, T.C. Memo. 1993-642.  Further, the exact amount of control required to find an employer-employee relationship varies with different occupations.  United States v. W.M. Webb, Inc., 397 U.S. 179, 192-193 (1970).  The threshold level of control necessary to find employee status is in most circumstances lower when applied to professional services than when applied to nonprofessional services.  Azad v. United States, 388 F.2d 74, 76-77 (8th Cir. 1968); Profl. & Exec. Leasing, Inc. v. Commissioner, 89 T.C. at 234.

When taken as a whole, the record in this case supports petitioner's assertion that he was an independent contractor of Techmatics and not an employee. While petitioner was on the payroll of Techmatics, he performed all of his services for the U.S. Navy. The Navy recruited him, arranged for him to work through Techmatics, and provided him with various work spaces, a travel budget, and computer equipment. To the contrary, Techmatics did not provide him office space or equipment. Techmatics provided no benefits typical of those provided to employees. Further, the temporary or as-needed basis of petitioner's work is reflected by his work history, where he worked steadily while certain Navy projects were ongoing but discontinued working when no other projects replaced them.

Moreover, petitioner believed he was an independent contractor when he began his arrangement with Techmatics. His behavior was consistent with that belief; petitioner submitted invoices for his time and expenses, was paid accordingly, and reported his income accordingly. The only change he contemplated when he began submitting time cards instead of invoices in 1996 was to help Techmatics facilitate its payroll administration. He did not ask for, nor did he receive, additional employee benefits other than Techmatics' payments of Social Security taxes on his behalf. The employment agreement sheds little light on the actual relationship from Techmatics' view, and no one from

Techmatics testified at trial. "A contract purporting to create an employer-employee relationship will not control where the common law factors (as applied to the facts and circumstances) establish that the relationship does not exist." Profl. & Exec. Leasing, Inc. v. Commissioner, 89 T.C. at 233. It was petitioner's relationship with the Navy and the needs of the Navy with respect to his projects that controlled the details of petitioner's services.

In sum, the facts and circumstances do not indicate an employer-employee relationship between petitioner and Techmatics. The Court holds that petitioner was an independent contractor of Techmatics during 1998. Accordingly, petitioner is entitled to deduct the claimed home office expenses as trade or business expenses for the year at issue. Petitioner is sustained on this issue.[7]

---

[7] As respondent has not sought to increase the deficiency by the amount of self-employment tax due under sec. 1401(a) in the event petitioner was found to have an independent contractor relationship with Techmatics, the Court makes no allowance for such an increase. Cf. Wickum v. Commissioner, T.C. Memo. 1998-270. The amounts paid petitioner for his services nonetheless represented gross receipts from a trade or business activity and did not represent wages or salaries. These amounts should have been reported on Schedule C of the return. As noted in the opinion, however, Social Security taxes were withheld from the compensation amounts paid to petitioner, and presumably Techmatics also paid an equivalent amount in Social Security taxes as a purported employer.

Reviewed and adopted as the report of the Small Tax Case Division.

Decision will be entered under Rule 155.